We'll move on to the fourth case of the day. This is Carl Gebauer, Jr. v. Commissioner Saul, number 19-1540, and we'll hear from Mr. Sutterfield again. This is a case where the administration simply tramples over its own Social Security ruling on fibromyalgia, which is SSR-12-2P. In the decision before you, the ALJ does a summary of why he gives little reliance to the opinions of Dr. Daters. The ALJ cites the absence of nerve conduction studies, muscle spasms, atrophy, weakness, reflux abnormalities, no edema. This is in the current decision. My point in terms of that is when you do an analysis of opinion evidence under 404-1527C, you go and look at how well supported is that. And then you could make a determination, and I certainly don't close the door to it, gee, the treating doctor's opinion is not up to snuff, and therefore I'm going to get a medical advisor, a medical expert in this case. But obviously that never happened in this instance. How could you even have the types of findings he makes in this decision with him even undergoing that analysis? If he undergoes the proper analysis of fibromyalgia and notes it has been diagnosed and notes her treatment and notes the other consistencies, I don't think he ever gets to a medical advisor. Then we get into, once we get past that, because again the case law is also very clear, is that simply getting a contrary opinion from a reviewing doctor is now substantial evidence. So you have to go through that analysis. Is that the way it happens sequentially though, Mr. Sutterfield, or did the ALJ decide, look, fibromyalgia is extremely complicated. And it's going to benefit this decisional process to get some expertise brought to bear upon how fibromyalgia is affecting this particular gentleman here. Or her, it's his wife, I'm sorry. I don't think he ever gets there though. Is that the way it happens sequentially? All he has to do, he's directed to follow the criteria in SSR 12-2P. No, my question is more basic than I think you're reacting to it. And that is, how does it sequence? Did the ALJ look at Dieters and say, well I don't have any confidence in Dieters, I need to go get a medical examiner. Or did it happen the other way? Before we get into the pool of medical evidence, I want to make sure that we have fibromyalgia expertise brought to bear upon this. I think, personally, when I have a client come in... It's just a factual question. How did it happen here? When did the ME enter the picture? Well, the ME enters the picture after we have, on a remand to begin with, is where the ME comes into the picture the first time. So again, ALJ is certainly... Pre-hearing?  This is a re-hearing. Yep. Okay. So that's problematic, though, in terms of how you even get to an ME when the case law of this circuit says you don't... Simply getting a contrary opinion isn't sufficient. If you go through the process of under 404.1427C, if you go through that process, you don't get there. You're arguing that it was an error for the ALJ to bring in the medical examiner? I think, as an outset question, and then we get into the lack of reliability of the examiners. But I think, at the outset... And the reason for that is the analysis, when you look at the ALJ's analysis, at page 15 of his decision, for example, he's discounting everything that's not a fibromyalgia criteria. Nerve conduction studies, muscle spasms, no atrophy, no weakness, no reflex abnormalities, no edema. Oh, gee, we better get a... I mean, how do you go through a hearing with a rheumatologist who doesn't even delineate any of those type of items, much less what the ALJ is directed to consider under SSR 12-2P? To me, it's subterfuge. I have clients come to me on a fibromyalgia case. I'll be honest with you. Your case will more likely than not go to federal district court, no matter its merits. I don't care what medicines you're on. That is my experience as a person out in the field. And I view, in your question earlier, that's the scope, that's the viewpoint I look at. That this is going to be a defensive battle. It's going to get denied. How do I put the case together for down the road? Then we get into the problems with the medical expert herself. And we have her saying, in terms of the...it's treated with diet and exercise. And that was one of the things I got submitted post-hearing on this, was her reiteration of that as her sole analysis of some of these functional limitations. Where did you come up with these functional limitations? Oh, diet and exercise treats this. Well, surgery treats back impairments too. That doesn't tell us how somebody functions. I mean, it's kind of a silly analysis. But when you get into her testimony, her methodology in terms of determining RFC, again, there's no basics to it. When I ask her about it, are you speculating? Yeah, I'm speculating. Again, case law says, clearly, you can't have an ALJ opinion based on speculation. And here, that's coming from their expert, who's testified for over 30 years that she has never had somebody who is disabled by fibromyalgia as a stand-alone impairment. That's contrary, again, to SSR 2-P, 12-2P. It's contrary to that same Social Security ruling, which states that listing 14.09, I believe, is the medical equivalent under the listing. Well, the listing is not, you know, you don't even get to whether somebody can do sedentary work. She's taking a posture up front. It doesn't eliminate sedentary work at all. Thirty years of testifying, and that's completely contrary to the case law. You know, Sarche, which was the initial case that this court ever considered on that, she wasn't 50. So, again, the issue under the grids, can she do sedentary work? One of your more recent cases also is, again, an individual, in the site of my brief, is an individual under the age of 50. You don't get there. She would never get you there. And this court, by its remands, has obviously considered, yes, obviously, sedentary work can be precluded by fibromyalgia. They bring in an expert who says, oh, no, never. So I read one of the aspects of the ALJ opinion that struck me. This isn't on the ME. This is on Dr. Daters. The Dr. Daters filled out two reports in, like, 2011 and then again in 2014. And in those reports said that the fibromyalgia would prevent the claimant from performing sedentary work. And the ALJ's issue with that is that it's not aligning with what's in the medical records, you know, at approximately the same time, Dr. Daters' own medical records. Can you comment on that? That seems to be the reason that Daters was discounted. I know why you like Daters. You like Daters because of those two reports. But the ALJ seemed to look at whether his overall finding aligned with what was in the medical records. But the ALJ's finding on page 15, where he recounts what's missing, gives us insight that the ALJ is considering the wrong criteria. It would be like somebody that they're claiming a heart impairment due to arrhythmia, and the ALJ is saying, I don't see the artery blockage. It doesn't have anything to do with it. The ALJ on page 15 recounts an entire paragraph where nerve conduction studies are normal, no muscle spasms, no atrophy, all those type of things. That's where, so in answer to your question. So that's a different argument, though. That's an argument that the ALJ just doesn't get fibromyalgia. Right. But then how can he be concerned with Dr. Daters' conclusion that she's incapable of performing CPR? I think he drew an inconsistency conclusion with respect to Daters. I don't think he identified any inconsistency. And she's, again, on a lot of medications that are constantly being tried up on. No, that's page 16, page 17. That's the whole point of those pages, I thought. So look at the bottom of page 16, for example. Write that for example paragraph. Tachycardia. No, she's in mild pain. She's not evidencing disabling pain. She did not note any joint motion limitations. So I think the ALJ was saying, well, how does that align with what he put in his reports? Well, again, joint motion limitations is not part of fibromyalgia to begin with. But also, in terms of fibromyalgia, you can have periods where you don't function horribly. It's certainly not a disabling impairment. My wife has it. She knows the art. I don't know the art. She does it. It's not a disabling impairment per se. So someone can have normal periods of functioning and not have an issue. But again, the very last sentence of that paragraph, going over to the next page, he's back on these criteria that have nothing to do with fibromyalgia. And that's the problem with his analysis. It's just not considering the right impairment. And I think my analogy I made to one type of heart impairment versus another is accurate here. Gee, I need an expert because I'm not sure I can put my mind into his rationale other than he's not on the right page. Thank you, Mr. Sutterfield. For the commissioner, Mr. Gregory. If you may please the court, my name is Michael Gregory. I'm here on behalf of the Commissioner of Social Security. Your Honors, in this case, the ALJ went above and beyond in several ways in order to develop the record. First, he did so by obtaining the medical opinion of a board-certified rheumatologist, Dr. Winkler. This was a prudent and diligent step. A rheumatologist's opinion was so important in this particular case because the Central District of Illinois had remanded a previous ALJ's decision, and in that remand specifically ordered the agency to give further consideration to the claimant's subjective statements regarding fibromyalgia. As you mentioned earlier, fibromyalgia can be very difficult to assess, and there was no rheumatologist opinion on the record prior to that. And the ALJ wanted to get this right. Second, the ALJ held an administrative hearing that lasted over three hours. Three hours were filled with vigorous cross-examination to both the medical expert and the vocational expert. How does that compare with the average? That would be, in my experience of reading these transcripts, well above the average. In fact, two-thirds through the transcript, the ALJ notes that they've exceeded the maximum time allowed. Later yet in the hearing, he says something. He reassures about that he will stay until things shut down and until the boss throws him out. So he really availed himself to allowing as much cross-examination as to a appellate's heart's content, really. In addition to this, the ALJ offered the appellant additional avenues for further action if he so chose to take it. For instance, the ALJ asked whether the record was complete. The appellate said it was. After hearing Dr. Winkler's testimony, the appellant did not change his answer. The ALJ reminded the appellant of his right to request a supplemental hearing. He agreed to proceed. The hearing is subject to that right, but the appellant never exercised that right at any time. Now, to speak to your concern earlier about timing, I can't tell you exactly what day the ALJ looked at, you know, the evidence or this or that, but I can tell you that the Appeals Council issued its remand on October 28th in 2016. This case was reassigned to the ALJ Thompson, who had not heard the case previously, and then within about a month, I believe it was November 30th, 2016, they sent a notice of the supplemental hearing, which took place on April 3rd, 2017. So within a month of the Appeals Council remanding the case, you know, the information went to the ALJ. This is a totally new case for them. Like you said, this was a case involving fibromyalgia. The remand specifically stated to look at subjective statements regarding fibromyalgia, and in the notice of hearing, it included a notice that they would seek the medical opinion of a rheumatologist. So, you know, in terms of a turnaround, it's fairly quick to, you know, within a month to have decided to obtain a medical expert's opinion. You know, so contrary to maybe what Ethel was putting forth, that, you know, again, without any evidence on the record that the ALJ had looked through the record and made decisions and done part of the analysis beforehand, there's not really anything to support that position. So regarding the medical expert, as the ALJ pointed out in its decision, the agency affords the ALJ pretty broad discretionary authority to seek the opinion of a medical expert. In fact, in Appellant's opening brief, he directs the court to four lines of questioning that each independently relate to a justification that the ALJ may, in their discretion, bring a medical expert. So the ALJ was certainly within his right to bring a medical expert and was certainly prudent to do so in a case involving fibromyalgia. Could you address specifically the argument that this medical expert apparently has never thought that fibromyalgia can be disabling? Yeah, I believe that's a misreading of Dr. Winkler's testimony. If you look at the testimony, I believe she says, I've had patients with fibromyalgia as well as other health issues that I have felt were not capable of working at the sedentary level. I think that in and of itself dispels this argument. Later in the questioning, Appellant's representative asked further questions about whether fibromyalgia alone could possibly do so. And again, she represented that she could, that it depended on a number of things. But in either event, that line of questioning wasn't very important to this case because, as explained in the ALJ's decision, this particular claimant had a number of simultaneous impairments. Her first answer to that direct question specifically says, I have found people in this circumstance that would be unable to work at that level. So I think the transfer doesn't bear out that argument. Speaking next to assessing fibromyalgia generally, the policy ruling that Appellant points to, Part 2, 12.12-2P, gives a two-step process for evaluating fibromyalgia. And Appellant's argument conflates the two a little bit. In the first step is really determining whether an individual has fibromyalgia, because fibromyalgia can be difficult to diagnose. And so there are certain objective evidence that you look to in order to establish whether or not they have fibromyalgia. The best example is probably trigger points. That's what's most associated with fibromyalgia. So when Appellant says the ALJ considered things that weren't related to fibromyalgia, what the ALJ was then doing was Step 2, because they determined that she had fibromyalgia. That was a medically determinable impairment. It was severe. Step 1 is satisfied. Then you go on to Step 2. And what Step 2 does is says we figured out at Step 1 that they have fibromyalgia. Now what we need to do is figure out the symptoms that are likely to come from fibromyalgia, oftentimes pain. We need to figure out what those symptoms will cause in terms of functional limitations. And so in that assessment, the policy ruling cross-references Section 404 CFR 1529C, which gives the assessment for the regulatory factors to go through the subjective statements. And what you're doing there is, for example, if you say you have disabling pain, you do look towards some sort of objective evidence that might see how the pain itself actually limits a person. For example, somebody who says they can't barely walk or move because of pain, it would be expected that they have an impaired gait or something of that nature. If they say my back is so 10 out of 10 painful, it would be expected to see a limited range of motion due to that pain. So you look to see how the pain manifests itself in limitations. And that's the evidence that the ALJ is discussing, and that's the evidence that he found inconsistent with Dr. Dieter's opinion. So while the additional evidence is not what is considered at Step 1, this is a two-step analysis, and it was very proper for the ALJ to consider all the evidence at Step 2. Because 12-2P does not place the limitations that it imposes for diagnostic purposes on the kind of functional considerations at Step 2. That's correct. And, in fact, the ALJ says something in his decision that trigger points, while they establish the diagnosis, it doesn't establish that she needs to take breaks. And so it speaks exactly to that bifurcation of SSR 12-2P. So if your Honors don't have any other questions, the Commissioner will rest on his brief. All right. Thank you, Mr. Gregory. Thank you. How much time? If you need one minute. In turning to the transcript, when I asked the vocational or medical advisor about this finding of other individuals, that would be on pages 610-12. And she said, oh, yes, as he indicated, I found people incapable of performing sedentary work on a full-time basis. What's in the record that's not in this record is what I asked. Usually there are other health issues. And I would go through that. And then bottom line, going to the next page, she found one person, one person over the course of a 27-, 28-year period incapable of doing sedentary work solely on the basis of fibromyalgia. One. SSR 12-2P would not exist if that was the case. That's just she's an outlier. She's not reliable. Thank you. Okay. Thanks to both counsel. The case will be taken under advisement.